UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ROBERT HILTON, on Behalf of Himself and All
Others Similarly Situated; and LOUIS VASQUEZ,

                              Plaintiffs,

                 vs                                          9:05-CV-1038

LESTER N. WRIGHT, M.D., M.P.H., Associate
Commissioner/Chief Medical Officer, for the New
York State Department of Correctional Services;
and NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES,
                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                OF COUNSEL:

KOOB & MAGOOLAGHAN                           ALEXANDER A. REINERT, ESQ.
Attorneys for Plaintiffs                    KEITH M. DONOGHUE, ESQ.
Suite 408
19 Fulton Street
New York, New York 10038

HON. ELIOT SPITZER                          NELSON SHEINGOLD, ESQ.
Attorney General of the                     Asst. Attorney General
  State of New York
Attorney for Defendants
Department of Law
The Capitol
Albany, New York 12224

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

        Plaintiffs Robert Hilton ("Hilton") and Louis Vasquez ("Vasquez") bring suit against

Lester N. Wright, M.D. ("Dr. Wright"), Associate Commissioner/Chief Medical Officer for the

New York State Department of Correctional Services ("DOCS"), and DOCS itself (collectively referred to as "defendants").  Both Hilton and Vasquez have Hepatitis C and are inmates under defendants' care and custody; they claim that defendants refused to administer necessary treatment for their Hepatitis C because they had not completed a DOCS-sponsored substance abuse program.  Plaintiffs assert that defendants' failure to administer treatment was tantamount to a deprivation of their right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution.  They filed suit against defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, seeking injunctive and declaratory relief, as well as compensatory and punitive damages, based on defendants' failure to provide combination treatment for their Hepatitis C.

Plaintiffs move to certify the class pursuant to Rule 23 of the Federal Rules of Civil Procedure.  Defendants oppose and cross-move for dismissal.  They argue that because the prior substance abuse policy has been rescinded and plaintiffs are currently receiving the necessary treatment, plaintiffs' equitable claims should be dismissed as moot.  Plaintiffs oppose.

Oral argument was heard on November 10, 2005, in Utica, New York.  Decision was reserved.

## II.  FACTS

Hilton and Vasquez are inmates who suffer from Hepatitis C and are under defendants' care and custody.  They were identified by their treating physicians as patients in need of treatment for this progressive disease - specifically, combination antiviral therapy that

is currently recognized as the standard treatment for Hepatitis C.  Despite being repeatedly recommended for treatment by their attending physicians, defendants denied plaintiffs the standard combination treatment for their Hepatitis C because of DOCS' Hepatitis C Primary Care Practice Guideline ("Guideline").

Pursuant to the Guideline, when an inmate diagnosed with Hepatitis C has admitted to using drugs or alcohol in the past, defendants conditioned receipt of the standard combination treatment on completion of a DOCS substance abuse counseling program. DOCS' Guideline specified that in order to receive treatment, inmates must have "[n]o evidence of active substance abuse . . . during the past 6 months . . . [and] [t]hose who have a substance use history must successfully complete or be enrolled in an ASAT/RSAT program." (Docket No. 13, Ex. B, Guideline at 4.)  Alcohol and Substance Abuse Treatment ("ASAT") and Residential Substance Abuse Treatment ("RSAT") are DOCS' principal prison-run substance abuse counseling programs; each spans a six-month period.  Typically, there are long waiting lists to get into either program.[1]  Because they had not met the ASAT/RSAT requirement, plaintiffs were denied the standard combination treatment for their Hepatitis C.

Hilton was diagnosed with Hepatitis C in late 1999.  In 2002, his doctors at a New York City hospital commenced the combination antiviral treatment of his disease.  He was to receive a 48-week course of the combination treatment; however, it was interrupted after 12 weeks, when he became homeless.  He entered defendants' custody on or about August 18, 2004, and reported to their medical staff that he suffered from Hepatitis C and had previously been undergoing combination therapy.  However, defendants did not begin to evaluate him

---

[1]  In fact, in 2004, at least one DOCS facility had more than 1,000 prisoners on the waiting list for their ASAT/RSAT program.  (Docket No. 11, Am. Compl. ¶ 114.)

for Hepatitis C treatment until October 2004 - that process was not completed until March 2005, when he was medically cleared for Hepatitis C treatment.  Plaintiffs claim that this process should take no longer than six weeks, yet defendants did not complete Hilton's evaluation for seven months.

After being medically cleared for treatment, Hilton was examined by a gastroenterologist in late April 2005, who recommended that he begin treatment with the combination therapy.  He was cleared to receive the combination therapy on or about May 4, 2005, yet defendants subsequently denied him treatment because he had not completed an ASAT/RSAT program.[2]  He was placed on a waiting list for the RSAT program at Altona Correctional Facility, but Dr. Wright informed Altona's medical staff that Hilton was still not qualified for the treatment because he was not actively enrolled in RSAT.  Shortly after that, Hilton was transferred to Washington Correctional Facility, where he filed a prison grievance demanding immediate combination treatment.  The Washington Inmate Grievance Resolution Committee unanimously recommended that DOCS provide him with the standard combination treatment, but that recommendation was rejected both by the superintendent of the Washington facility and by DOCS' Central Review Committee, after Hilton appealed.  During the appeal process, staff at Washington attempted to enroll Hilton in its ASAT program.  However, at the end of July 2005, his application to enroll was rejected because he was eligible for parole on November 2, 2005, which would be prior to the six-month conclusion of the program.

---

[2]  In 1993, when previously in DOCS' custody, Hilton admitted that he had smoked marijuana and sniffed cocaine as a teenager.  Subsequent drug tests, while he was in the custody of DOCS or on parole, showed Hilton to be drug free.  When he was taken into custody in August 2004, he denied any ongoing drug use or abuse.  (Am. Compl. ¶¶ 62-64.)

In August 2005, Hilton commenced this action.  Pursuant to a stipulation and order dated August 23, 2005, Dr. Wright finally agreed to direct his physician to administer the combination treatment.

Vasquez's story is similar.  He was first diagnosed with Hepatitis C at the end of August 2004, while he was in DOCS' custody, but was not approved for treatment until January 2005.  When he hadn't received treatment by March 2005, he filed a grievance with the Inmate Grievance Resolution Committee, which unanimously recommended that his grievance be granted.  However, at his next doctor's appointment, Vasquez was still not given any medication; he was later informed by his doctor that Dr. Wright had suspended the doctor's request that he receive treatment because Dr. Wright couldn't confirm that he had completed the ASAT/RSAT requirement.  All of his appeals for treatment were denied.

Vasquez then wrote to Dr. Wright, questioning why he was required to participate in an ASAT/RSAT program in order to receive treatment for his Hepatitis C.  He informed Dr. Wright that in 1991, while he was in custody, he completed a three-month prison-run drug treatment program, and had been drug-free for 25 years.  Dr. Wright responded that the 1991 program was insufficient, and reiterated that Vasquez would not receive treatment until he fulfilled the ASAT/RSAT requirement.  Only when he was joined as a plaintiff in this action did Dr. Wright allow Vasquez to receive the combination treatment for his Hepatitis C.

On October 13, 2005, Dr. Wright rescinded the ASAT/RSAT requirement from the Guideline; the new provision ("Revised Guideline") now reads: "Those who have a substance abuse history are strongly encouraged to complete an ASAT/RSAT program since dealing with alcohol or substance use issues is an essential part of their Hepatitis C treatment and protection program."  (Docket No. 17, Defs.' Mem. Ex. B at 4.)  He forwarded the Revised

Guideline by e-mail ("Wright e-mail") to medical officials throughout DOCS on October 18, 2005, instructing them to "review any Hepatitis C patients for whom [ASAT/RSAT] issues may have been the contraindication for treatment and submit/resubmit Request for Treatment e-forms for those who medically qualify for treatment according to the revised care guideline."  (Defs.' Mem. Ex. C.)  Additionally, Dr. Wright submitted an affidavit ("Wright Decl.") stating that he has "no intention of re-instituting the repealed ASAT/RSAT requirement."  (Defs.' Mem. Decl. ¶ 9.)

Prior to Dr. Wright's revision, DOCS' ASAT/RSAT policy had been dealt severe judicial blows by the New York state and federal courts.  In cases with fact patterns analogous to the instant case, two federal courts found that inmate plaintiffs stated allegations sufficient to survive defendants' motions to dismiss and for summary judgment, respectively.  See McKenna v. Wright, 386 F.3d 432 (2d Cir. 2004); Johnson v. Wright, 412 F.3d 398 (2d Cir. 2005).  Additionally, two state courts found the ASAT/RSAT policy unconstitutional and ordered defendants to provide treatment to the inmate plaintiffs bringing suit.  See Domenech v. Goord, 797 N.Y.S.2d 313 (N.Y. App. Div. 2d Dep't 2005); Docket No. 13, Reinert Supp. Aff. Ex. C (unpublished opinion in Rodriguez v. Goord, Index No. 6940-04 (N.Y. Sup. Ct. Albany Cty. 2005)).  Defendants resisted the court orders.  Rather than treat the inmates infected with Hepatitis C immediately, as the state courts ordered, in each case, defendants delayed treatment and obtained a stay pending appeal.  (See Docket No. 20, Pl. Opp'n. Mem. at 8.)  Only after defendants lost the appeal did Domenech receive treatment. Rodriguez is still awaiting treatment.[3]

---

[3] By a motion dated October 25, 2005 - 12 days after Dr. Wright made the change to the Guideline - defendants requested relief from the ruling ordering defendants to treat Rodriguez.  (Pl. Opp. Mem. at 9.)

Defendants made it clear, in both Dr. Wright's communication with DOCS' medical personnel and in his Declaration, that the renunciation of the ASAT/RSAT requirement was solely because of litigation, and not because they view the ASAT/RSAT requirement to be inappropriate.[4]  (See Wright Decl. ¶ 8).  Dr. Wright himself stated: "I revised the Guideline in response to guidance provided by several appellate court decisions regarding application of the former guideline's ASAT/RSAT component in individual cases."  Id.

Currently, there are over 9,000 prisoners under defendants' care who have been diagnosed with Hepatitis C.  Prior to Dr. Wright's revocation of the ASAT/RSAT requirement, although 6-12% of the inmates with Hepatitis C were medically appropriate candidates for the standard combination therapy, less than 2% of those prisoners received the combination treatment.  All 9,000 were subjected to the ASAT/RSAT requirement.

## III.  DISCUSSION

Although defendants' motion to dismiss was made by cross-motion, it will be addressed first, since a disposition in defendants' favor would render plaintiffs' motion for class certification moot.

---

[4] Indeed, in a letter to Domenech's counsel, dated July 25, 2005, notifying them of Domenech's Hepatitis C treatment, Assistant Solicitor General David Lawrence III stated that "[p]rovision of the medication is solely to comply with the court decision and order, *and not because DOCS believes it is medically appropriate*." (Reinert Supp. Aff. Ex. B (emphasis added)).

## A.  Defendants' Cross-Motion to Dismiss

Defendants submit that because the ASAT/RSAT requirement has been rescinded, plaintiffs' claims for equitable relief should be dismissed as moot, and their motion for class certification should be denied.[5]

Parties seeking to have claims dismissed as moot bear a heavy burden, as the test for mootness is stringent.  See United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S. Ct. 894, 897 (1953); Lillbask v. Connecticut Dep't of Educ., 397 F.3d 77, 84 (2d Cir. 2005). "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203, 89 S. Ct. 361, 364 (1968) (quoting W.T. Grant, 345 U.S. at 632, 73 S. Ct. at 897).  If, however, after voluntary ceasing to engage in the allegedly illegal activities, "the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," such cessation will usually render a case moot.  Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565, 574 (2d Cir. 2003) (quoting Campbell v. Greisberger, 80 F.3d 703, 706 (2d Cir. 1996)). A determination of whether a case is moot as a result of voluntary cessation lies within the sound discretion of the district court.  Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, 981 F.2d 50, 59 (2d Cir. 1992).

---

[5]  Plaintiffs originally sought to certify as a class "plaintiffs and all Hepatitis-C-infected prisoners in DOCS custody who must now or in the future meet defendants' ASAT/RSAT requirement to obtain treatment." (Docket No. 13, Pl. Mem. at 5.)  However, given that the ASAT/RSAT requirement has been rescinded, plaintiffs were permitted to amend the class at oral argument.

1. **Recurrence**

A case is not moot unless there is "no reasonable expectation" that the challenged actions will be repeated.  <u>See</u>, <u>e.g.</u>, <u>W.T. Grant</u>, 345 U.S. at 633, 73 S. Ct. at 897.  A defendant's voluntary cessation of a policy will render a case moot only if it is "absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur."  <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 189, 120 S. Ct. 693, 708 (2000) (quoting <u>Concentrated Phosphate Exp. Ass'n</u>, 393 U.S. at 203, 89 S. Ct. at 364).

Defendants rely heavily on <u>Tawwab v. Metz</u>, 554 F.2d 22, 24 (2d Cir. 1977) and <u>Armstrong v. Ward</u>, 529 F.2d 1132, 1135-36 (2d Cir. 1976) in arguing that Dr. Wright's change in policy and his unconditional statement that he has no intention of reinstituting the ASAT/RSAT requirement eliminates any "reasonable expectation" that the provision will be reinstated.[6]  However, those cases are factually distinguishable from the events in this case.

In <u>Tawwab</u>, prisoners in the Great Meadow Correctional Facility brought suit challenging a Great Meadow policy that only allowed one prisoner at a time to see his attorney.  554 F.2d at 23.  The complaint was dismissed by the district court, and the

---

[6] In their papers and at oral argument, defendants also relied on these cases in arguing that because Dr. Wright is a state official, deference should be given to his statement that he "has no intention of re-instituting the repealed ASAT/RSAT requirement."  (Wright Decl. ¶ 9.)  However, while "[s]ome deference must be accorded to a state's representations that certain conduct has been discontinued," <u>Harrison & Burrowes Bridge Constructors</u>, 981 F.2d at 59, in <u>Armstrong</u> itself, the Second Circuit made clear that "determination of whether there is a 'reasonable expectation that the wrong will be repeated' is not foreclosed by the expressions of intention by the State officials," 529 F.2d at 1136.

Additionally, defendants cite <u>Lamar Adver. of Penn, LLC v. Town of Orchard Park</u>, 356 F.3d 365, 377 (2d Cir. 2004), for the proposition that "mootness based upon deference to the state actors' decision to amend or rescind the challenged provision is the rule, not the exception."  (Defs' Mem. at 6.)  However, this proposition is overbroad; further examination of <u>Lamar</u> indicates that the Second Circuit intended this rule to be limited to a *legislative body's* decision to amend a challenged law.  <u>See Lamar</u>, 356 F.3d at 377.  As the court limited its analysis to the repeal and/or amendment of legislative enactments, there is no indication that the Second Circuit intended its holding to be broadly extended to state actors categorically.

plaintiffs appealed; at oral argument before the Second Circuit, the attorney for Great Meadow informed the court that the policy had been changed, and the prisoners were no longer subject to the restriction at issue.  Id. at 23-24.  The Second Circuit held that the change in policy "embodied in an official prison document . . . handed up to the Court during oral argument" made it clear that the wrongful behavior could not reasonably be expected to recur; thus, the prisoners' claim for injunctive relief was moot.  Id. at 24.

Defendants also rely on Armstrong, where a complaint filed by female inmates at the Bedford Hills Correctional Facility seeking an injunction against further transfers from Bedford Hills to Fishkill Correctional Facility was dismissed as moot.  529 F.2d at 1135.  After the suit commenced, the State closed the women's unit of Fishkill, and although it gave no assurances that the unit would remain closed, the State made clear that if reopened, Fishkill's conditions would be improved.  Id. at 1133-34.  Further, no inmate at Bedford Hills would be transferred to Fishkill without her consent.  Id. at 1134.

Here, Dr. Wright's repeal of the ASAT/RSAT requirement is a change in defendants' policy regarding the treatment of inmates infected with Hepatitis C - on that fact alone, Tawwab and Armstrong would appear to control.  However, a number of circumstances in this case, absent from the facts both of Tawwab and Armstrong, dictate a different result. While Dr. Wright transmitted the change in policy via a memorandum on DOCS letterhead and a follow-up e-mail and has stated that he has no intention of re-instituting the ASAT/RSAT requirement, his motivation for the change is questionable at best.  Dr. Wright himself has stated that he was motivated to change the ASAT/RSAT requirement, not because of his belief that prisoners should be treated without completing the program and not because he believed that making treatment contingent upon the completion of an

ASAT/RSAT program violated inmates' constitutional rights, but because of "guidance" given by the appellate courts.  This "guidance" came in the form of losses in three appellate cases challenging the ASAT/RSAT requirement as applied to different inmates.[7]

Additionally, it is significant that Dr. Wright's repudiation of the ASAT/RSAT requirement came on the eve of the filing of defendants' opposition papers - his original memo rescinding the requirement was dated October 13, 2005, the e-mail to DOCS officials detailing the change went out on October 18, 2005, and defendants' memorandum of law in opposition to plaintiffs' motion for class certification was dated October 21, 2005.  This swift change in policy, as argument was swiftly approaching in a case challenging the same policy that had led to three losses in state and federal appellate courts, prompts questions of defendants' credibility and gives rise to suspicions that defendants have simply manufactured an argument of mootness.  See United States v. New York City Transit Auth., 97 F.3d 672, 676 (2d Cir. 1996) ("We also think it is significant that the change of policy was instituted on the eve of the lawsuit."); Ahrens v. Bowen, 852 F.2d 49, 53 (2d Cir. 1988) ("The fact that the Secretary, who had repeatedly refused to waive recoupment in the present case over a five year period, suddenly elected to do so on the eve of plaintiffs' motion for summary judgment . . . suggests an attempt by the Secretary to conjure up an argument for mootness and thwart adjudication of the issue.").  Based on the above exigent circumstances, Tawwab and Armstrong are distinguishable and thus, not controlling.

The facts of this case are more in line with the facts in Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565 (2d Cir. 2003) and New York City Transit Auth., 97 F.3d 672.  In

---

[7] See Johnson v. Wright, 412 F.3d 398 (2d Cir. 2005); McKenna v. Wright, 386 F.3d 432 (2d Cir. 2004); Domenech v. Goord, 797 N.Y.S.2d 313 (N.Y. App. Div. 2d Dep't 2005).

Tsombanidis, the plaintiff challenged a provision of the fire code addressing whether residents could be considered members of a single-family dwelling for purposes of the fire code.  352 F.3d at 573.  Despite testimony by the Deputy State Fire Marshal that he had changed the interpretation of the code so that it wouldn't impact the plaintiff, and the fire inspector had stated he would follow the new interpretation, the Second Circuit rejected the Fire Department's mootness argument.  Id. at 574.  The court found that the Fire Department had not met its heavy burden "because the interpretation of the code might change again - for example, upon a change in the State Fire Marshal's administration."  Id.

Additionally, in New York City Transit Auth., the EEOC challenged a Transit Authority policy as violative of Title VII.  97 F.3d at 674.  After negotiations during which the Transit Authority refused to sign either a conciliation agreement or a consent decree, the Transit Authority unilaterally changed the policy at issue and "represented that it had no plans to reinstitute it."  Id.  The Second Circuit rejected the Transit Authority's mootness argument, largely because although the Transit Authority had changed the policy, it had expressed reservations as to the effectiveness of the new policy, which "foreshadow[ed] the eventual abandonment of the policy or the modification of it in ways that would present again the same issues."  Id. at 676.[8]

Here, defendants have not met their heavy burden of demonstrating that there is no reasonable expectation that the challenged actions will recur.  After years of insisting that completion of the ASAT/RSAT requirement was a mandatory requirement for those who

---

[8]  In reaching the conclusion that the case was not moot, the Second Circuit considered and distinguished both Tawwab and Armstrong, finding that although changes in official policy in those cases rendered the controversy moot, circumstances surrounding the Transit Authority's change in policy that were not present in those cases dictated a different result.

were infected with Hepatitis C and wished to receive the combination treatment, Dr. Wright

rescinded the requirement on the eve of defendants' submission of their opposition papers.

However, his recission was not necessarily a complete recission of the policy - while Dr.

Wright no longer makes receiving the combination treatment contingent upon completion of

the ASAT/RSAT requirement, his revised policy still states that completion of the

ASAT/RSAT program is "essential" to proper Hepatitis C treatment.  Similar to the

defendants in New York City Transit Auth., Dr. Wright has changed a policy, but he has

made it clear that he doesn't believe in the change.  Rescinding a requirement, yet

maintaining that it is "essential" to proper treatment leads to speculation that at some point in

the future, the program could again become mandatory, given that in the past, Dr. Wright

apparently only treated inmates who had not met his ASAT/RSAT requirement when he was

under court order.

Furthermore, like in Tsombanidis, Dr. Wright's actions cannot bind all future

Associate Commissioner/Chief Medical Officers of DOCS.  There, in rejecting the Fire

Department's mootness argument, the Second Circuit highlighted the possibility that a

change in the State Fire Marshal's administration could lead to a return to the challenged

conduct; the same possibility exists in this case.  While Dr. Wright has averred that he has no

intention of reinstating the ASAT/RSAT requirement, future commissioners, who have broad

discretion in policymaking and interpretation, could again hinge receipt of the standard

combination treatment on completion of an ASAT/RSAT program.

Circumstances surrounding Dr. Wright's repudiation of the requirement, and his

inability to bind future commissioners of DOCS, demonstrate that the change in policy did not

render this case moot.  Defendants have not demonstrated that there is "no reasonable

expectation" that the ASAT/RSAT requirement will be reinstated; thus, it is not clear that the defendants' conduct will not recur.

### 2. Interim Relief

Even if defendants had demonstrated that there is no reasonable expectation that the challenged conduct will recur, defendants' mootness claim would fail because they have not shown that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," a finding that is required in order to succeed on their mootness argument. Tsombanidis, 352 F.3d at 574.

Although both Hilton and Vasquez are now receiving the combination treatment, it does not follow that all Hepatitis C-infected inmates medically eligible for the treatment will in fact receive the treatment. As previously noted, there are over 9,000 inmates in DOCS custody that have been diagnosed with Hepatitis C - and only two percent of them are currently receiving the standard combination treatment. While not all inmates are medically eligible for the combination treatment (approximately 6-12% of the infected inmates currently in DOCS custody are eligible), many inmates that are eligible were denied treatment solely because of the prior ASAT/RSAT requirement.

Defendants have repudiated the mandatory aspect of the ASAT/RSAT requirement, and Dr. Wright has ordered DOCS medical personnel to "review any Hepatitis C patients for whom [ASAT/RSAT] issues may have been the contraindication for treatment and submit/resubmit Request for Treatment e-forms for those who medically qualify for treatment according to the revised care guideline." (Wright e-mail.) But, review does not necessarily translate into treatment - while some inmates will invariably receive the treatment based on

Dr. Wright's directive, it is not clear that all the inmates that were denied the treatment based on their failure to complete an ASAT/RSAT program will now receive the treatment.

Defendants have given no assurance that each member of the class that plaintiffs seek to certify - all Hepatitis C-infected prisoners in defendants' custody, including plaintiffs, who were subject to defendants' substance abuse policy, and but for that policy, would have received the standard combination treatment - will be treated fairly and now receive treatment.  A general directive to "review" the files of the thousands of inmates infected with Hepatitis C currently in DOCS care and custody does not "completely and irrevocably" eradicate the effects of the prior ASAT/RSAT requirement.  It may be a beginning, but it is far from an eradication.

Because defendants have not shown that (1) "no reasonable expectation" remains that the ASAT/RSAT requirement will be reinstated, and (2) Dr. Wright's October 18, 2005, e-mail announcement of the Guideline change resulted in a complete eradication of the effects of the prior ASAT/RSAT requirement, defendants have not established that plaintiffs' equitable claims and motion for class certification are moot.  Therefore, their cross-motion to dismiss will be denied.

### B.  Plaintiffs' Motion for Class Certification

"'In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 have been met.'"  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S. Ct. 2140, 2153 (1974) (quoting Miller v. Mackey Int'l, 452 F.2d 424 (5th Cir. 1971)).  Thus, when deciding a motion to certify a class, the allegations in the complaint are accepted as true.  See Shelter Realty Corp. v. Allied Maint. Corp., 574 F.2d 656, 661

n.15 (2d Cir. 1978).  "Rule 23 requires a litigant who would bring a class action to overcome two hurdles.  First, he must satisfy all the conditions of 23(a) and then he must also convince the court that his action is appropriate under one of the three subdivisions of 23(b)."  Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968); Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614, 117 S. Ct. 2231, 2245 (1997).

The plaintiffs, as the party seeking class certification, bear the burden of proof in demonstrating that the requirements have been met.  Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999); Verdow v. Sutkowy, 209 F.R.D. 309, 311 (N.D.N.Y. 2002).  However, plaintiffs are not required to make an extensive evidentiary showing. Verdow , 209 F.R.D. at 311.  Further, courts are implored to construe liberally the Rule 23 requirements.  Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968); Verdow , 209 F.R.D. at 311.

### 1.  Rule 23(a) Prerequisites

The Rule 23(a) prerequisites to a class action are: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  In common legal parlance, these requirements are generally referred to as numerosity, commonality, typicality, and adequacy of representation.  See General Tel. Co. v. EEOC, 446 U.S. 318, 330, 100 S. Ct. 1698, 1706 (1980).

Defendants assert that there is no prospective class.  They argue that "the ASAT/RSAT requirement is the sole basis upon which plaintiffs assert commonality,

typicality, and adequacy of representation under Rule 23," and that because defendants have repudiated the ASAT/RSAT requirement, plaintiffs' equitable claims and petition for class certification are moot.  (Docket No. 22, Defs.' Reply Mem. at 3.)  However, as discussed *supra*, plaintiffs' claims are not moot.  Thus, their motion for class certification will be considered.

The first requirement that plaintiffs must prove under Rule 23(a) is that the prospective class is so numerous that joinder is "impracticable."  Fed. R. Civ. P. 23(a)(1). "Impracticable" in this context is not equivalent to "impossible," and plaintiffs need not even precisely quantify the prospective class so long as they reasonably estimate the number of potential class members.  See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993); Verdow, 209 F.R.D. at 311.  The Second Circuit has held that a prospective class of forty or more raises a presumption of numerosity.  See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

Plaintiffs assert that the class consists of at least 500 Hepatitis C-infected prisoners in defendants' custody, including plaintiffs, who were subject to defendants' previous ASAT/RSAT requirement, and but for that policy, would have received the standard combination treatment.  Currently, there are over 9,000 inmates with Hepatitis C in defendants' custody, and all were subjected to the ASAT/RSAT requirement.  At the time of litigation, only 2% were receiving the standard combination treatment, although anywhere from 6-12% of the infected inmates were medically eligible.  These potential class members are located in DOCS facilities throughout New York State.  Defendants do not challenge these numbers.

Plaintiffs have demonstrated sufficient numerosity - a class consisting of at least 500 inmates meets the numerosity requirement.  See Consol. Rail. Corp., 47 F.3d at 483. Further, joinder here would be extremely impracticable, given that the estimated class members are dispersed throughout the state of New York.

The second requirement of commonality requires a showing that the prospective class members share common questions of law or fact.  Fed. R. Civ. P. 23(a)(2).  Where the "claims of all proposed class members derive from the same [] policies and procedures, and are based on the same legal theories," the commonality requirement is met.  McNeill v. New York City Hous. Auth., 719 F. Supp. 233, 252 (S.D.N.Y. 1989).

Here, the named plaintiffs and the members of the proposed class base their Eighth and Fourteenth Amendment cruel and unusual punishment, ADA, and Section 504 claims on defendants' prior ASAT/RSAT requirement.  That is, but for defendants' ASAT/RSAT requirement, plaintiffs and the proposed members of the class would have received the standard combination treatment.  The representative parties and the putative class members have the same legal claims based on the same official procedure.  Accordingly, the commonality requirement is met.  See id.

The third requirement, typicality, requires that claims or defenses of the representative party or parties are typical of those of the prospective class.  Fed. R. Civ. P. 23(a)(3).  The representative claims need not be identical to the claims of every class member in order to meet the typicality requirement.  McNeill, 719 F. Supp. at 252.  But, the "disputed issue of law or fact [must] occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class."  Caridad, 191 F.3d at 293 (internal quotations omitted).  Here, the claims of the representative parties and

the members of the prospective class all center around defendants' application of the now-rescinded ASAT/RSAT requirement, which defendants applied to all Hepatitis C-infected prisoners in their custody.  Therefore, the typicality requirement is met.

The final requirement under Rule 23(a) is that the representative parties will fairly and adequately protect the interests of the prospective class.  Fed. R. Civ. P. 23(a)(4).  When determining if this requirement is met, a plaintiff must make two showings: (1) that counsel for the prospective class is qualified, experienced, and generally able to conduct the litigation; and (2) that the class members, especially the representative party, do not have interests antagonistic to one another.  See In re Joint Eastern & Southern Dist. Asbestos Litigation, 78 F.3d 764, 778 (2d Cir. 1996).  The attorneys representing the named plaintiffs and seeking to represent the putative class have established that they are qualified, experienced, and are generally able to conduct this litigation.  Defendants make no viable arguments to the contrary.  Nor do the class members have interests antagonistic to one another.  Plaintiffs, like the members of the proposed class, have been refused the standard combination treatment for their Hepatitis C because of defendants' prior ASAT/RSAT policy.  The claims of plaintiffs are consistent and complementary to those of the prospective class.  Accordingly, plaintiffs have demonstrated that they can adequately represent the interests of the proposed class.

Plaintiffs have met the prerequisites of Rule 23(a).  Consideration of the requirements of Rules 23(b)(2) and 23(b)(1), upon which plaintiffs base their motion for class certification, will be determinative of the motion.

**2.  Rule 23(b)(2)**

_____This subsection permits class certification if "the party opposing the class has acted

or refused to act on grounds generally applicable to the class, thereby making appropriate

final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

Fed. R. Civ. P. 23(b)(2).  In other words, a class will be certified if "broad, class-wide

injunctive or declaratory relief is necessary to redress a group-wide injury."  Robinson v.

Metro-North Commuter R.R. Co., 267 F.3d 147, 162 (2d Cir. 2001).

> Where class-wide injunctive or declaratory relief is sought in a (b)(2) class
> action for an alleged group harm, there is a presumption of cohesion and
> unity between absent class members and the class representatives such
> that adequate representation will generally safeguard absent class
> members' interests and thereby satisfy the strictures of due process.  This
> presumption of cohesion and unity continues where incidental damages are
> also sought because entitlement to such damages does not vary based on
> the subjective considerations of each class member's claim, but flows
> directly from a finding of liability on the claims for class-wide injunctive and
> declaratory relief.

Id. at 165 (internal quotations and citations omitted).

In this case, the prior ASAT/RSAT requirement was generally applicable to all

Hepatitis C-infected inmates in defendants' care and custody, thus is generally applicable to

all prospective class members, not just the named plaintiffs.  In fact, the ASAT/RSAT

requirement effectively defines members of the potential class - those that but for the

ASAT/RSAT requirement would have received the standard combination treatment.

Therefore, final injunctive relief or corresponding declaratory relief with respect to the class

as a whole is appropriate.  See id. at 162.  Moreover, while the named plaintiffs also seek

monetary damages, this litigation centers around the application of the previous ASAT/RSAT

policy, which was applicable to all inmates infected with Hepatitis C.  Accordingly, class certification under Rule 23(b)(2) is appropriate.

### 3.  **Rule 23(b)(1)**

Plaintiffs contend that even if class certification under Rule 23(b)(2) is not appropriate, class certification would be maintainable under Rule 23(b)(1)(B) or 23(b)(1)(A).

Rule 23(b)(1)(B) permits class certifications where

> the prosecution of separate actions by or against individual members of the class would create a risk of . . . adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1)(B).  Typically, certification of these classes is based on a "limited fund" theory, where certification is proper where the putative class members' only source of legal recovery comes from a limited fund.  See e.g., Ortiz v. Fibreboard Corp., 527 U.S. 815, 834-838, 119 S. Ct. 2295, 2309 (1999).  However, while "the limited fund scenario is the 'paradigm suit' under Rule 23(b)(1)(B), courts have also granted certification under this subsection to classes of inmates seeking injunctive relief."  Ingles v. City of New York, No. 01 Civ. 8279(DC), 2003 WL 402565, at *8 (S.D.N.Y. Feb. 20, 2003) (citing cases).[9]

Here, plaintiffs argue that a ruling in this case awarding/denying injunctive and declaratory relief would affect the rights of the absent class members, enhancing or curtailing their ability to bring similar claims; thus, class certification would be proper under Rule

---

[9] In Ortiz, the Supreme Court also gave other examples of cases where the rights of absent plaintiffs may be affected by disposition of an individual suit: "suits brought to reorganize fraternal-benefit societies; . . . actions by shareholders to declare a dividend or otherwise to fix [their] rights;   . . . and actions charging a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of beneficiaries."  527 U.S. at 834, 119 S. Ct. at 2309 (internal citations and quotations omitted).

23(b)(1)(B).  Plaintiffs' allegations illustrate that an individual adjudication of the equitable

claims raised by plaintiffs would indeed affect the interests of the absent class members.

Further, the members of the potential class are currently inmates, and the equitable relief

sought would apply equally to the prospective and named plaintiffs in this action.

Certification under Rule 23(b)(1)(B) is not reserved only for those bringing "limited fund"

claims.  See Ortiz, 527 U.S. at 834, 119 S. Ct. at 2308-09; Ingles, 2003 WL 402565, at *8.

Thus, class certification under Rule 23(b)(1)(B) is also appropriate.

Additionally, plaintiffs alternatively maintain that class certification would also be

proper under Rule 23(b)(1)(A), which authorizes a class action if "the prosecution of separate

actions by or against individual members of the class would create a risk of . . . inconsistent

or varying adjudications with respect to individual members of the class which would

establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ.

P. 23(b)(1)(A).  "Courts are still struggling to develop guidelines governing the scope of Rule

23(b)(1)(A)."  In re Simon II Litig., 407 F.3d 125, 133 n.6 (2d Cir. 2005) (internal citations and

quotations omitted).[10]  However, examples of where certification under Rule 23(b)(1)(A)

would be appropriate include "'where the [defendant] is obliged by law to treat the members

of the class alike (a utility acting toward customers; a government imposing a tax), or where

the [defendant] must treat all alike as a matter of practical necessity (a riparian owner using

water as against downriver owners).'" Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614,

117 S. Ct. 2231, 2245 (1997) (quoting Benjamin Kaplan, Continuing Work of the Civil

---

[10] In fact, the Second Circuit expressly declined to decide whether the plaintiffs in Simon II
satisfied the requirements of 23(b)(1)(A).  407 F.3d at 133 n.6.

- 22 -

Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 HARV. L. REV. 356, 388 (1967) (citations omitted)).

In the instant case, certification under Rule 23(b)(1)(A) would also be proper, as there is a risk of inconsistent adjudication that may "establish incompatible standards of conduct" for the defendants.  Fed. R. Civ. P. 23(b)(1)(A).  The members of the proposed class of plaintiffs are scattered throughout the state of New York; individual cases would inevitably be brought in a variety of state and federal courts, where there is a definite possibility of inconsistent results.  Such litigation - where hundreds of plaintiffs would bring the same claims against the defendants in a multitude of state and federal courts - can only prejudice both parties.  Additionally, defendants are "obliged by law to treat the members of the class alike," which only strengthens plaintiffs case for certification under Rule 23(b)(1)(A). See Amchem Prods., 521 U.S. at 614, 117 S. Ct. at 2245.  Here, defendants did treat the members of the potential class alike - they made the standard combination treatment for Hepatitis C contingent upon meeting the former ASAT/RSAT requirement.  It is the blanket imposition of that policy that is at issue here.  Accordingly, class certification is also proper under Rule 23(b)(1)(A).

### 4. Appointment of Class Counsel

Plaintiffs' attorneys have also petitioned to be appointed class counsel, pursuant to Rule 23(g)(2)(b), as they are the only applicant for appointment.  To be appointed, plaintiffs' counsel "must fairly and adequately represent the interests of the class" and meet the requirements of Rule 23(g)(1)(B) and (C), which state, *inter alia*, that a court must consider (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and claims of the

type asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources counsel will commit to representing the class."  Fed. R. Civ. P. 23(g)(1)(B) and (C).

After consideration of the requirements of Rule 23(g), given their experience and expertise in this area of law, especially with cases involving defendants' former ASAT/RSAT requirement - and in the absence of objection by defendants, plaintiffs' counsel will be appointed as class counsel.

## IV.  **CONCLUSION**

Dr. Wright and DOCS have failed to demonstrate that (1) "no reasonable expectation" remains that the ASAT/RSAT requirement will not be reinstated or retained in fact, and (2) Dr. Wright's October 18, 2005, e-mail notification of the ASAT/RSAT Guideline change resulted in a complete eradication of the effects of the previous ASAT/RSAT policy. Thus, plaintiffs' equitable claims and motion for class certification are not moot, and defendants' cross-motion to dismiss is denied.

Hilton and Vasquez meet the numerosity, commonality, typicality, and adequacy of representation prerequisites of Rule 23(a).  Additionally, final injunctive or declaratory relief would be appropriate to the class as a whole pertaining to the prior ASAT/RSAT policy, which meets the requirements for certification of Rule 23(b)(2).  Adjudication of plaintiffs' claims for injunctive and declaratory relief would enhance or curtail the absent plaintiffs' ability to bring similar claims, which also meets the requirements for certification under Rule 23(b)(1)(B). The circumstances of this case present a situation evincing a risk of inconsistent adjudication that may "establish incompatible standards of conduct" for the defendants, were the putative class members to individually bring injunctive and declaratory claims against the defendants.

Thus, the putative class is also appropriate for certification pursuant to Rule 23(b)(1)(A).

Plaintiffs' counsel is appointed class counsel pursuant to Rule 23(g).

Therefore, it is

ORDERED that

1.  Defendants' cross-motion to dismiss is DENIED;

2.  Plaintiffs' motion for class certification is GRANTED;

3.  Plaintiffs' counsel is appointed as class counsel.

IT IS SO ORDERED.

Dated:   February 27, 2006
         Utica, New York.

United States District Judge